May 14, 2010

Randall L. Kallinen, Esq.
Attorney at Law
511 Broadway Street
Houston, Texas  77012

> **RE: DARIN DUNCAN VS. UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON; CIVIL ACTION NO. 4:09-CV-00715; IN THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.**

Dear Mr. Kallinen:

This memorandum, written under the rules and regulations commonly referred to as the "Below Market Discount Method" by the United States Fifth Circuit Courts, as promulgated in the causes of action <u>Culver vs. Slater Boat Co.</u> [722 F.2d 114 (5th Cir. 1983) (en banc)] and <u>Jones & Laughlin Steel Corp vs. Pfeifer</u> [103 S. Ct. 2541 (1983)] will serve as my initial economic loss analysis in regards to the wages and future earnings capacity of Mr. Darin Duncan.

**Data  Relied  Upon**

In order to compile this economic damage report, the undersigned utilized and relied upon the following information:

> *1)* Plaintiff's Original Complaint;

> *2)* Partial / Master Economic Checklist;

> *3)* Darin Duncan Partial Personal Resume; and

> *4)* Physician Compensation and Production Survey (2008 Report Based upon 2007 Data); Medical Group Management Association, Englewood, Colorado.

**RE: In the Matter of Darin Duncan**
**continued …../…..**

**Page 2.**

## Introduction and Assumptions

The appraisal of the impaired earning capacity and other economic damages suffered by and to an individual because of an "incident" is generally based upon the individual's personal history and the probable course of the future.  The measure of damages involves, in most cases, determining the individual's earning capacity had the "incident" not occurred.  In the matter at hand, the following are presumed about Darin Duncan:

> Date of birth was October 25, 1970 and in September, 2008, Lt. Duncan was approximately thirty-eight (38) years of age;

> Lt. Duncan was a fourth year medical student at the University of Texas Health Science Center in Houston in 2008;

> Date of "incident" that caused alleged situation was September 29, 2008;

> Lt. Duncan clearly did have a demonstrated adult earning capacity having worked for Dynegy, Inc.;

> Lt. Duncan, before entering the University of Texas Health Science Center was a graduate of San Jacinto Community College (2002) University of Houston (2003) and the Rice University Jones School of Business wherein he earned a Master of Business Administration ("MBA");

> According to data in the Statistical Abstract of the United States (2009 edition, page 76, table 101) the statistical lifespan for a Caucasian male born in 1970 is 77.6 years of age; and

> The evaluation of the future earning capacity of Lt. Duncan may be based upon the average earnings capacity of males with a medical degree who become a specialist as an anesthesiologist.

RE: In the Matter of Darin Duncan
continued …../…...

Page 3.


## Overall Background Data


Lieutenant Darin Duncan is the holder of a Master of Business Administration ("MBA") degree from Rice University and was a fourth year medical student at the University of Texas Health Science Center at Houston, when he was expelled in the Fall of 2008.  Even though his grades were good, for "noncognitive" reasons, reasons that were never made clear, Mr. Duncan was expelled from the University.  UTHSCH is a public entity and when considering UTHSCH's stated reasons for dismissal, such reasons did not constitute grounds for expulsion as set forth in the Student Handbook.  Lt. Duncan suffers from very severe Major Depressive Disorder and any stated reasons for his dismissal were the result of such disability for which he is now receiving treatment.


While Mr. Duncan was performing his Internal Medicine Ward service rotation, Professor Ikenna Ogbaa, M.D., credited his attentiveness and ability to provide an on-the-spot complete medical history to alert the hospital staff to a patient in a critical arrhythmia due to a large bilateral pulmonary emboli.  Lt. Duncan is also a capable medical officer in the United States military providing medical services to our military, including the Rangers, Special Forces, and aviation and airborne personnel.


In his second year of medical school, 2006, Mr. Duncan was suffering from depression and came up for school discipline by the Student Evaluation and Promotions Committee because of alleged unwanted (non-physical) romantic advances toward a female medical student.  A Hispanic student took something Mr. Duncan had written as demeaning to Hispanics, and Mr. Duncan allegedly did not finish a portion of one class.  Mr. Duncan was sent to a psychiatrist, Dr. Axelrad, by UTHSCH as part of the discipline process.


While Lt. Duncan believed himself to be a patient of Dr. Axelrad's, and Dr. Axelrad's paperwork clearly refers to Lt. Duncan as a "patient," Dr. Axelrad now alleges he was performing a "forensic psychiatric evaluation" paid for by UTHSCH.  Dr. Axelrad failed to diagnose Lt. Duncan with a medical health condition and wrote that Lt. Duncan's disciplinary behaviors could not be attributed to any "significant psychiatric problems or disorders."

RE: In the Matter of Darin Duncan
continued …../…..

Page 4.

Dr. Axelrad did further opine that Lt. Duncan had integrated the three disciplinary situations and was motivated to continue in medical school.  Lt. Duncan was allowed to continue his medical school education.

In his last year of medical school in June, 2008, Lt. Duncan took Cardiology and passed, but received a "marginal performance" which does not warrant SEPC scrutiny or dismissal under the written policies and procedures of UTHSCH.  Despite dismissal under the circumstance being fully against UTHSCH written policies Lt. Duncan was dismissed from the Medical school by the SEPC.

In an appeal letter to Dean Giuseppe N. Colasurdo, M.D. in August, 2008, Lt. Duncan attributes his problems with depression that UTHSCH's contractor Dr. Axelrad had not diagnosed.  Despite bringing up the fact that he should not be dismissed under UTHSCH's written rules and that he suffered from depression, Dean Colasurdo queried no further and instead affirmed Lt. Duncan's dismissal by letter dated September 29, 2008.  The situation that brought Lt. Duncan before the SEPC were a result of depression even though the situation he was eventually dismissed for, a marginal grade in Cardiology, is not grounds for dismissal.

Armed with the recent diagnosis of very severe Major Depression and with the help from Attorney Randall L. Kallinen, Lt. Duncan again appealed his dismissal to Dean Colasurdo as well as informed H. Scott Caven, Jr., Chairman, Office of the Board of Regents of the University of Texas System; Kenneth I. Shine, M.D., Interim Chancellor, The University of Texas System, Executive Vice Chancellor of Health Affairs; Larry R. Kaiser, M.D., President; James R. Huffines, Vice Chairman of the Office of the Board of Regents of University of Texas System; and L. Maximilian Buja, M.D., Executive Vice President for Academic Affairs, The University of Texas Health Science Center at Houston, by letter dated November 3, 2008.  The letter allowed UTHSCH to reconsider the expulsion and to contact Lt. Duncan directly regarding accommodations for his depression.  UTHSCH did not provide Lt. Duncan any due process procedure and as of the date of this report document has not made any changes to Lt. Duncan's status.

Comparing his projected medical income earnings that is financially and economically supported in the files of the undersigned, with economic earnings data on business professional personnel in the United States, along with the Employment Cost Index (ECI) by Industry and Occupation (2002 - 2007) allows us the opportunity to combine these facts into a succinct economic scenario.  For the reader's reference, the basic source of economic data utilized by the undersigned Economist is

RE: In the Matter of Darin Duncan
continued …../…..

Page 5.

contained in the most recent edition (128th edition) of the <u>Statistical Abstract of the United States,</u> published by the U.S. Department of Commerce, Bureau of the Census, 2009.

If the "limited" evidence on Lt. Duncan as provided the undersigned is accurate, or even moderately accurate, then Lt. Duncan, in the opinion of the undersigned, will suffer the difference in earnings between that of a medical anesthesiologist and that of an MBA businessman from the projected date of his medical career until his projected retirement at age seventy (70).   The undersigned has calculated his projected lost earnings based upon and to comply with and conform to the "Below Market Discount Method" on an economic basis.

The data reflecting his future income losses are denoted in Exhibit A as attached hereto:

NOTES TO EXHIBIT "A":

1)  The "Potential Income" data is based upon the projected income earnings of Lt. Duncan once he became a physician and increase by 3.0% per year.

2)  The income increases in the "Projected Income" column, are three (3.0%) percent merit wage increases and do **not** include any increases for inflation, based off the 2009 year.

3)  The tax rates utilized above are 20.0% per year of the net loss income;

4)  The "Below Market Discount Rate" utilized is three (3.0%) percent.  This is based upon a "today" (2008) Market Rate of six (6.0%) percent, minus three (3.0%) percent for inflation.

Thus, it can be easily noted, that in a future projected (front pay) medical working career period commencing six (6) years after medical school graduation (2014 until 2040) Lt. Duncan, in the economic opinion of the undersigned, utilizing the Below Market Discount rate basis, and based upon Lt. Duncan obtaining position(s) whose income rate is substantially below those he would have earned in the medical profession, he will suffer an income loss after the payment of United States Federal Income taxes at 20.0% of yearly gross income on a below market income basis (as

**RE: In the Matter of Darin Duncan**
**continued …../…...**

**Page 6.**

discounted) of $4,690,000 (rounded), including fringe benefits based upon the difference between his two (2) projected career positions.  This figure was derived by establishing an initial medical income for Lt. Duncan based medical earning data (***NOTE:*** An anesthesiologist in 2007 earned $399,000.  In regard to Lt. Duncan, his medical career income commences at $200,000 per year in 2014, after additional required medical education and increases at $25,000 per year (early year merit increases) until he reaches $400,000 and then increases at a constant rate for <u>only merit increases</u> of three percent (3.0%) per year until 2040.  From these yearly amounts, one subtracts the income Lt Duncan is projected to earn in an alternative career, namely working as an MBA businessman and then discounting the yearly differences by the Below Market Discount Rate of the real rate of interest as 3.0% (6.0% [nominal rate] – 3.0% (rate of inflation) = 3.0%; the real rate of interest).

RE: In the Matter of Darin Duncan
continued …../…...

Page 7.

## Retirement (Social Security Analysis)

In addition to Lt. Duncan's work loss analysis as noted above, due to his decreased work income his retirement income will be also reduced.  While it is extremely difficult to predict long range Social Security income losses due to changes in the law by Congress, over time, one fact is certain - if you contribute less, you receive less.  As such, the undersigned has estimated, on a conservative basis that for the period of Lt. Duncan's retirement at age seventy (70) in 2040 until his statistical death (see appendix) at age 77.6 in the year 2047.6, he will receive at least $750 per month less than if he had worked his full career at his projected medical career income(s).

With a statistical retirement calculated at 7.6 years (the year 2040 until the year 2047.6), that equates to 91 months or an actual dollar loss (not including any interest or inflationary forces) of $68,250.

UNITED STATES DISTRICT COURTS
FEDERAL RULES OF CIVIL PROCEDURE
RULE 26 - DISCLOSURE OF EXPERT TESTIMONY

Based upon the Federal Rules of Civil Procedure – Rule 26(a)(2)(b), and to comply with same the following are noted in regards to the report herein:

All opinions expressed by the undersigned Economist are included in the report herein.  There are no other conclusions or thoughts of the undersigned Economist in regard to this case that are not included in the report, herein.  The basis and reasons for the opinions of the undersigned Economist were formulated after reading and reviewing a body of data that included court documentation, medical and financial records.  Aside from the report, and the graphs and data included and attached to the report in the appendix of the report, there are no other exhibits to be utilized by the undersigned Economist as a summary to support the opinions expressed, herein.

The qualifications of the undersigned are attached to this report as an exhibit to the report, herein.  The undersigned Economist in the last ten (10) years had published the following articles:

**RE: In the Matter of Darin Duncan**
**continued …../…...**

**Page 8.**

2004, Senior Economist for publication "The Small Business Guide to HSA's, by JoAnn Mills Laing, New York, New York.

2005, Senior Economist for publication "The Consumer's Guide to Health Savings Accounts, by JoAnn Mills Laing, New York, New York.

2008, "The Two Obamas: The Dual Economic Dilemma of Financial Crisis Politics" in <u>The Impact of the Obama Administration's Financial Crisis, Policies</u>," An Aspatore Special Report, Thomson Reuters.

2008. "The 21ˢᵗ Century Mortgage and Secondary Marketplace" in <u>The Financial Crisis,</u> A Thomson Reuters / West Report, Andrews Publication.

2009 "Antitrust Assistance for the U.S. Auto Industry" in <u>Antitrust – Andrews Litigation Reporter</u>, West Publications, March.

The undersigned Economist, as of the writing of this report has received a retainer fee of $1,000 and is scheduled to be compensated at the rate of one hundred and seventy five dollars per hour ($175) for the work performed.  As additional work, studies, output, testimony or effort is requested by the undersigned Economist, they will be billed by the undersigned Economist at the time they are performed at the same rate of $175 per hour.

A listing of all other cases in which the undersigned Economist has testified as an expert at trial, by deposition or by furnishing a report in the last four (4) years is attached to this report, herein.

RE: In the Matter of Darin Duncan
continued …../…..

Page 9.

# SUMMARY

In an overall economic summary, Lt. Darin Duncan, in the economic opinion of the undersigned already has or will suffer the following financial / economic losses, as a result of the "incident":

|  |  |
|---|---|
| Past Lost Income (No Discounting Necessary)<br>(2008 – 2013) | None |
| Future Lost Income (Below Market Discount Rate)<br>(2014 – 2040) | $4,690,000 |
| Reduced Social Security Benefits<br>(2041 – Onwards) | $68,000 |

The numbers enumerated and outlined above on a Below Market Discounted Basis (where appropriate) calculate to a total loss of *$4,758,000  (rounded).*

The undersigned trusts this brief overall economic analysis will serve as a guide in your discussions with the appropriate parties and Court of Law.  If you desire any additional information, please feel free to call upon the undersigned at any time.

Respectfully  submitted,

Dr.  Kenneth  Eugene  Lehrer
LEHRER FINANCIAL AND ECONOMIC ADVISORY SERVICES

KEL:lm
attachments (several charts; tabular sets of data).